IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| COLLEEN KESSLER, | ) | CASE NO.  1:22-CV-00459-JDG |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | MAGISTRATE JUDGE |
| | ) | JONATHAN D. GREENBERG |
| COMMISSIONER OF THE SOCIAL | ) | |
| SECURITY ADMINISTRATION, | ) | **MEMORANDUM OF OPINION AND** |
| | ) | **ORDER** |
| Defendant. | ) | |

Plaintiff, Colleen Kessler ("Plaintiff" or "Kessler"), challenges the final decision of Defendant, Kilolo Kijakazi,[1] Acting Commissioner of Social Security ("Commissioner"), denying her application for a Period of Disability ("POD") and Disability Insurance Benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 416(i), 423, and 1381 *et seq.* ("Act").  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g) and the consent of the parties, pursuant to 28 U.S.C. § 636(c)(2).  For the reasons set forth below, the Commissioner's final decision is VACATED AND REMANDED for further consideration consistent with this opinion.

## I.    PROCEDURAL HISTORY

In January 2020, Kessler filed an application for POD and DIB, alleging a disability onset date of February 7, 2019, and claiming she was disabled due to: lumbar spinal stenosis; neurogenic claudication; degenerative facet arthropathy; spinal canal stenosis lumbar; spinal foraminal stenosis lumbar; degenerative disc disease; retrolisthesis L4-5, Type Two modic discogenic endplate changes; osteoarthritis; and lumbar radiculopathy.  (Transcript ("Tr.") at 15, 59.)  The application was denied

---

[1] On July 9, 2021, Kilolo Kijakazi became the Acting Commissioner of Social Security.

initially and upon reconsideration, and Kessler requested a hearing before an administrative law judge ("ALJ").  (*Id.* at 15.)

On February 3, 2021, an ALJ held a hearing, during which Kessler, represented by counsel, and an impartial vocational expert ("VE") testified.  (*Id.*)  On February 17, 2021, the ALJ issued a written decision finding Plaintiff was not disabled.  (*Id.* at 15-25.)  The ALJ' s decision became final on January 18, 2022, when the Appeals Council declined further review.  (*Id.* at 1-6.)

On March 23, 2022, Kessler filed her Complaint to challenge the Commissioner's final decision. (Doc. No. 1.)  The parties have completed briefing in this case.  (Doc. Nos. 7-9.)  Kessler asserts the following assignments of error:

(1) The Administrative Law Judge's ('ALJ' [sic]) finding concerning the plaintiff's residual functional capacity is not supported by substantial evidence.

(2) The ALJ's reliance on the vocational experts [sic] testimony is not supported by substantial evidence.

(Doc. No. 7.)


## II.     EVIDENCE

### A.     Personal and Vocational Evidence

Kessler was born in February 1961 and was 59 years-old at the time of her administrative hearing (Tr. 15, 24), making her a "person of advanced age" under Social Security regulations.  *See* 20 C.F.R. § 404.1563(e).  She has at least a high school education and is able to communicate in English.  (Tr. 24.) She has past relevant work as a nurse, general duty.  (*Id.*)

2

**B.     Relevant Medical Evidence[2]**

On January 18, 2019, Kessler saw Jeremy Amps, M.D., for a spine surgery consultation.  (Tr. 242.) Kessler reported she had an epidural steroid injection about a month ago, which eliminated her left leg pain and reduced her right leg pain by 50% for about two weeks.  (*Id.*)  However, the pain returned and worsened, and Kessler complained of numbness in the medial thigh when crossing her legs, pain into the lateral legs when laying on her sides, pain in the posterior thighs to the knees, numbness and tingling in the anterior and lateral thighs, and mild low back pain.  (*Id.*)  Kessler reported the pain woke her up.  (*Id.*) Kessler denied any new weakness.  (*Id.*)  She smoked about a pack per day.  (*Id.*)  On examination, Dr. Amps found full strength, normal sensory examination, and normal gait.  (*Id. at 243.*)  Dr. Amps believed Kessler's pain was radicular and recommended surgery.  (*Id.*)  Kessler wanted to undergo the surgery. (*Id.*)

On February 7, 2019, Kessler underwent bilateral L4-5 hemilaminotomy, bilateral L5 foraminotomy, and left L4 foraminotomy.  (*Id. at 233-34.*)

On March 18, 2019, Kessler saw Dr. Amps for her first post-op appointment.  (*Id. at 244.*)  She reported some soreness in her back with increased activity, improving incisional pain, some leg pain with increased standing, some numbness and tingling in the thighs with standing, and some right leg pain at night that woke her up.  (*Id.*)  Kessler told Dr. Amps her posterior thigh pain had improved.  (*Id.*)  She denied any weakness.  (*Id.*)  Dr. Amps noted overall improvement and recommended she start physical therapy soon.  (*Id.*)

On March 19, 2019, Kessler saw Christine Donaldson, PT, for a physical therapy evaluation.  (*Id. at 252.*)  Kessler reported steady improvement; however, she continued to have low back pain and stiffness, and she needed to be careful with her movements.  (*Id.*)  Donaldson noted Kessler presented with

---

[2]  The Court's recitation of the medical evidence is not intended to be exhaustive and is limited to the evidence cited in the parties' Briefs.

pain, posture deviations, limited lumbar range of motion, hamstring tightness, and mild lower extremity weakness.  (*Id.*)

On March 28, 2019, Kessler saw PT Donaldson for another physical therapy appointment.  (*Id.* at 331.)  Kessler reported she had been doing her home exercise program and walking every day, and she was feeling stronger.  (*Id.* at 332.)  Kessler told Donaldson she had done "some pretty good cleaning" that day, so she was a little sore, and then had gone grocery shopping despite her soreness.  (*Id.*)

On April 18, 2019, PT Donaldson discharged Kessler from physical therapy after Kessler met all of her goals, including independence in her home exercise program, decrease pain to 2/10 with functional activities, increase active lumbar range of motion to minimally limited flexion and full extension, increase strength of the lower extremities to 4+/5, increase flexibility of hamstrings to 10-15 degrees, and improve functional score.  (*Id.* at 324.)  Kessler reported she was "doing great" and was going back to work the next week.  (*Id.*)  Kessler denied any pain after her session.  (*Id.* at 325.)  Kessler was to continue her home exercise program.  (*Id.* at 325-26.)

On August 23, 2019, Kessler returned to Dr. Amps with complaints of pain in her legs from her hips to her thighs, as well as her low back, when standing for long periods of time, walking, and lying down.  (*Id.* at 246.)  Sometimes the pain radiated into her lower legs.  (*Id.*)  Kessler denied having problems sitting.  (*Id.*)  Kessler also complained of numbness and tingling in her thighs and occasional numbness in her groin.  (*Id.*)  Kessler endorsed some weakness with leg pain.  (*Id.*)  She had only been able to work four hour shifts since her surgery.  (*Id.*)  Kessler rated her pain as a 5/10 and described it as aching and burning.  (*Id.*)  Standing and walking worsened her pain, while sitting alleviated it.  (*Id.*)  Dr. Amps noted "impaired community distances" in Kessler's ambulatory status.  (*Id.*)  Dr. Amps diagnosed Kessler with bilateral hip pain, lumbar radiculopathy, lumbar spinal stenosis with neurogenic claudication, and lumbar spondylolisthesis.  (*Id.* at 247.)  Dr. Amps ordered a lumbar MRI.  (*Id.*)

4

X-rays of the lumbar spine dated August 27, 2019, revealed mild retrolisthesis of L4 in relation to L5 with resultant canal narrowing and degenerative facet arthropathy in the lower lumbar spine.  (*Id.* at 240.)  Mild narrowing was also present at L3/L4 and L2/L3.  (*Id.* at 241.)  There was no evidence of spondylosis or spondylolisthesis.  (*Id.*)

X-rays of the bilateral hips taken the same day revealed stable moderate degenerative changes of the lower lumbar spine and stable mild joint space narrowing of the bilateral hips.  (*Id.* at 238-39.)

On September 20, 2019, Kessler saw Dr. Amps for follow up after her MRI.  (*Id.* at 259.)  Kessler reported new pain in her hips, groin, and knees at night after laying down for a while.  (*Id.*)  The pain improved after she got up and moved around.  (*Id.*)  Kessler rated her pain as a 4/10, with it being an 8/10 at worst, and described the pain as aching and continuous with numbness and tingling.  (*Id.*)  Dr. Amps again noted Kessler's ambulatory status was "impaired for community distances."  (*Id.*)  Kessler's MRI revealed Type II discogenic endplate changes at L4-5, edema of the paraspinal soft tissues posterior to the L4 and L5 vertebral bodies, posterior disc bulge with mild residual narrowing of the spinal canal and left subarticular recess at L4-L5, and disc bulge and facet arthropathy contributing to mild right and moderate left foraminal stenosis at L4-L5, which had improved on the left since July 2018.  (*Id.* at 260.)  Dr. Amps recommended facet injections.  (*Id.*)

On September 23, 2019, Kessler saw Jeffrey Roberts, M.D., for a second opinion regarding her low back pain.  (*Id.* at 228.)  Kessler reported moderate low back pain, more on the right than left, as well as bilateral leg pain.  (*Id.*)  Kessler told Dr. Roberts her pain was aggravated by activity, prolonged sitting, standing, and walking, and was "[m]inimally alleviated" by ice and Advil.  (*Id.*)  Kessler also complained of associated aching, sharp pain, and stiffness.  (*Id.*)  Kessler reported she could not stand for long in the OR because of her left leg and thigh symptoms.  (*Id.*)  Sitting alleviated her pain.  (*Id.*)  Nerve blocks failed to alleviate her pain.  (*Id.*)  During physical therapy, her leg pain returned and after walking on a

5

treadmill for ten minutes, she experienced leg pain, numbness, and tingling.  (*Id.*)  Kessler told Dr. Roberts she could not work more than a four-hour shift because of her leg pain.  (*Id.*)  Within an hour, Kessler experienced tingling and burning.  (*Id.*)  On examination, Dr. Roberts found mild lumbar tenderness to palpation, no swelling, no sciatic notch tenderness, no greater trochanteric tenderness, the ability to stand on heels and toes, negative straight leg raise test, normal muscle strength, intact sensation. 2/4 deep tendon reflexes with augmentation, and 1/4 Achilles reflexes bilaterally.  (*Id.* at 230.)  Dr. Roberts reviewed Kessler's most recent MRI and noted that the superomedial aspect of the left L5 facet was still causing foraminal narrowing, the central canal was decompressed, and while there was foraminal narrowing on the right at L4-5, Dr. Roberts could "see the nerve root clearly and there is a nice fat signal around the nerve root."  (*Id.*)  Dr. Roberts opined:

> This is a very difficult problem because she has both back and leg pain.  If she had just leg pain, one might be able to go extraforaminally at L4-5 and do a further foraminotomy without destabilizing her spine to get rid of leg pain, however, she has both back and leg pain.  In my mind, this is something she is going to have to live with or quit smoking and undergo a spinal fusion.  Spinal fusion could be approached in many different ways, in my hands it would likely be a redo L4 laminectomy, a left L4-5 transforaminal lumbar interbody fusion using a cage, possibly an expandable cage so we can adequate distraction, and then a posterior spinal fusion with instrumentation L4 to L5.  The risks were not gone over with her for the surgery as this was not a surgical discussion but more of a second opinion as to what might be the source of her pain.  I spent about an hour with the patient.  I would be happy to further discuss this with her in the future.

(*Id.*)  Dr. Roberts diagnosed Kessler with intervertebral disc disorders with radiculopathy, lumbar region. (*Id.*)

On October 31, 2019, Kessler saw Daniel McLaughlin, M.D., for evaluation of ectasia of the abdominal aorta.  (*Id.* at 306.)  Kessler denied back pain and muscle pain.  (*Id.* at 308.)  On examination, Dr. McLaughlin found intact muscle strength, no tenderness, intact sensation to light touch, and no gross motor deficits.  (*Id.*)

6

On November 25, 2019, Kessler saw Dr. Amps for follow up.  (*Id.* at 264.)  Kessler continued to complain of severe low back pain that was worse with activity, as well as pain, numbness, and tingling in her thighs, left worse than right.  (*Id.*)  Standing worsened her pain, while sitting and a heating pad helped it.  (*Id.*)  Kessler reported feeling clumsier lately, and that she felt like she was losing her balance and was tripping over her right foot when walking.  (*Id.*)  Kessler rated her pain as a 3/10 and described it as burning, tingling, and aching.  (*Id.*)  Dr. Amps discussed spinal fusion with Kessler, but she wanted to avoid additional surgery.  (*Id.* at 265.)  Dr. Amps recommended bilateral L4-5 TFESI.  (*Id.*)

On March 9, 2020, Kessler saw Dr. Amps for follow up.  (*Id.* at 298.)  Kessler reported 30% relief from the TFESI in December 2019, and her claudication symptoms had recently returned.  (*Id.*)  Dr. Amps noted Kessler's physical exam was unchanged.  (*Id.* at 300.)  Dr. Amps diagnosed Kessler with bilateral lower extremity pain and lumbar radiculopathy.  (*Id.*)  Dr. Amps recommended acupuncture.  (*Id.*)

On June 22, 2020, Kessler saw James Wang, M.D., virtually for follow up of complaints of nausea, dizziness, fatigue, and change of bowel habits.  (*Id.* at 560.)  Dr. Wang noted Kessler had a history of autoimmune disease and positive ANA.  (*Id.*)  Kessler reported "profound fatigue," improving headaches, and poor sleep.  (*Id.*)  Dr. Wang noted Kessler's gait was not unsteady, her reflexes were normal and symmetric, and her sensation grossly intact.  (*Id.* at 562.)  Dr. Wang ordered blood work, a colonoscopy, and a mammogram.  (*Id.*)  Kessler's blood work revealed an elevated sed rate and positive ANA.  (*Id.* at 666-68.)

On July 31, 2020, Kessler went to Fairview Hospital with complaints of 10/10 right flank pain.  (*Id.* at 762-63.)  Imaging taken that day revealed a kidney stone, as well as advanced degenerative disc disease at L4-5, L5 left transverse process pseudoarthrosis with the sacrum, and tiny periumbilical fat-containing hernia.  (*Id.* at 693-94.)  Christopher Reese, M.D., noted Kessler was to undergo surgery for kidney stone removal.  (*Id.* at 763.)

7

On September 14, 2020, Kessler saw Susan Mathai, M.D., for follow up regarding her inflammatory arthritis.  (*Id.* at 755.)  Kessler reported tolerable chronic aches and pains but denied the fatigue and other flu-like symptoms that she had had in June of 2020.  (*Id.* at 756, 759.)  Dr. Mathai noted Plaquenil helped with Kessler's arthralgias but was stopped because of eye issues.  (*Id.* at 756.)  On examination, Dr. Mathai found normal gait and station, normal digits and nails, normal joints without pain, tenderness, swelling, and deformity/subluxation, except for tenderness to palpation of the bilateral trochanteric bursa and bilateral gluteal regions, and full range of motion.  (*Id.* at 758.)  Dr. Mathai noted Kessler had been doing "much better" after starting Plaquenil, although the arthralgias were mainly in her hands at that time, and when Kessler stopped Plaquenil, and her pain worsened.  (*Id.* at 759.)  Kessler restarted Plaquenil but noticed no improvement in her arthralgias, and she had to stop taking it because of eye issues.  (*Id.*)  Kessler reported Naprosyn was "sufficient for her arthralgias."  (*Id.*)  Dr. Mathai suspected most of Kessler's arthralgias were caused by DJD and not inflammatory arthritis.  (*Id.*)

## C.  State Agency Reports

On June 29, 2020, Lynne Torello, M.D., reviewed the file and opined Kessler could occasionally lift and/or carry 20 pounds, frequently lift and/or carry 10 pounds, stand and/or walk for about six hours in an eight-hour workday, and sit for about six hours in an eight-hour workday.  (*Id.* at 61.)  Dr. Torello further opined Kessler had the unlimited ability to balance, climb ramps and stairs, and climb ladders, ropes, and scaffolds.  (*Id.* at 61-62.)  Kessler could occasionally stoop and frequently kneel, crouch, and crawl.  (*Id.* at 62.)

On September 23, 2020, on reconsideration, Mehr Siddiqui, M.D., affirmed Dr. Torello's findings. (*Id.* at 67-68.)

## D.  Hearing Testimony

During the February 3, 2021 hearing, Kessler testified to the following:

- She worked as an operating nurse for the past 25 years.  (*Id.* at 32.)  Her alleged disability onset date is the date she underwent spinal surgery.  (*Id.*)  Her back surgery did not resolve her low back pain.  (*Id.* at 38.)  She did not have a lot of back pain before the surgery; instead, she had a lot of leg pain.  (*Id.*)  She went through physical therapy and tried to go back to work.  (*Id.*)  She pushed her return date back because she didn't feel strong enough.  (*Id.*)  She could not do eight-hour days.  (*Id.*)  She worked half days, but it was awful.  (*Id.*)  She had progressive groin pain and leg pain, and she could not sit or change positions in the OR.  (*Id.*)  She was sort of limping by the end of the day.  (*Id.*)  She wasn't doing her job well and she was distracting people because she could not stand still and had to move around a lot during surgery.  (*Id.* at 38-39.)  She did not undergo acupuncture and aquatic therapy.  (*Id.* at 39-40.) Her symptoms are getting worse now, and she has new symptoms.  (*Id.* at 40.)  Her husband does the cooking because she cannot stand that long.  (*Id.*)

- She is lucky to get four straight hours of sleep a night.  (*Id.*)  Then she has to get out of bed and move around before trying to go back to sleep on the couch.  (*Id.*)  Then the pain wakes her up again.  (*Id.*)  She feels fatigued throughout the day.  (*Id.*)  She manages the fatigue by taking frequent rests and lots of breaks.  (*Id.* at 41.)  Her pain and fatigue impact her ability to focus and concentrate.  (*Id.*)  Her job as an OR nurse required a lot of focus and concentration.  (*Id.*)  She was distracted because of her pain.  (*Id.* at 42.)  She was not "100 percent on [her] game at all and it showed."  (*Id.*)  It is depressing for her.  (*Id.* at 43.)  Her OR nurse job required a lot of concentration, knowledge, and skill, and she does not feel comfortable or capable of performing that work now from a mental perspective.  (*Id.* at 45.)

- She wakes up in the morning in so much pain.  (*Id.* at 33.)  Her legs are very achy.  (*Id.*)  Sometimes she wakes up very early and walks around the house in the hope that her pain subsides, which it usually does.  (*Id.*)  With COVID restrictions, she stays at home for the most part and she occupies her time with sewing masks to sell.  (*Id.*)  She can sew for half an hour at a time.  (*Id.* at 35.)  She does light housework throughout the day.  (*Id.* at 33.)  She changes positions throughout the day and takes breaks.  (*Id.*)  After standing for 15 minutes, she needs to sit down or sit on the couch and put her feet up.  (*Id.*)  After sitting for half an hour, she needs to get up and do something else.  (*Id.*)  She drives locally.  (*Id.*)  She cannot grocery shop as it takes too long and causes too much pain.  (*Id.*)  She can load the laundry.  (*Id.* at 34.)  Her husband carries the laundry baskets.  (*Id.* at 43-44.)  She tries not to go up and down the stairs a lot.  (*Id.* at 44.)

- She smokes about a pack a day.  (*Id.* at 34.)  Her doctors have encouraged her to quit.  (*Id.*)  She is a nurse, so she knows she should not smoke and what smoking does.  (*Id.*)  It is something she is working on.  (*Id.*)

- She has problems with her hands.  (*Id.* at 36.)  After surgery, she continued to have problems with her hands and was sent to a rheumatologist, who diagnosed her with inflammatory arthritis.  (*Id.*)  She was on Plaquenil, which worked well, but she started having eye problems and so she had to stop taking it.  (*Id.* at 36-37.)  She is

taking over the counter medication now.  (*Id.* at 37.)  Her hands still hurt, and she needs to have her husband open jars for her.  (*Id.*)  She still has weakness.  (*Id.*)

• She used to walk with their dogs and kids, but she cannot do it anymore.  (*Id.* at 43.) She can walk to a park 15 minutes away from her house, then she takes a break for a little bit, and then walks back.  (*Id.*)

The VE testified a few skills would transfer to light work.  (*Id.* at 47.)  The VE further testified Kessler had past work as a nurse, general duty, which include the operating room.  (*Id.*)  The ALJ then posed the following hypothetical question:

> This person is of the same age, education, and work background as Ms. Kessler. This person can lift/carry 20 pounds occasionally, 10 pounds frequently.  Can stand six out of eight.  Can walk six out of eight.  Can sit six out of eight.  No limit on push/pull or foot pedal.  This person can constantly use a ramp or stairs, constantly use a ladder, rope, or a scaffold, and constantly balance. Occasionally stoop, frequently kneel crouch or crawl.  Reaching in all planes bilaterally is constant.  Handing [sic] bilaterally is frequent.  Fingering is constant bilaterally.  Feeling is constant bilaterally.  There are no visual, communication, environmental or mental limitations.  And that's it.

(*Id.* at 48.)

The VE testified the hypothetical individual would be able to perform other representative jobs in the economy, such as surgical technician, office nurse, and unit clerk.  (*Id.* at 48-49.)

Counsel for Kessler modified the hypothetical to include, among other things, simple routine work with no more than three step tasks.  (*Id.* at 49.)  The VE testified the hypothetical individual could not perform Kessler's past work, or the other representative jobs the VE identified, because of the simple, repetitive task limitation.  (*Id.* at 49-50.)  All the jobs the VE identified and the job Kessler had in the past were skilled.  (*Id.* at 50.)

### III.    STANDARD FOR DISABILITY

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to

10

"result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315, 404.1505(a).

A claimant is entitled to a POD only if: (1) she had a disability; (2) she was insured when she became disabled; and (3) she filed while she was disabled or within twelve months of the date the disability ended. 42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process. 20 C.F.R. § 404.1520(a)(4). *See also Ealy v. Comm'r of Soc. Sec*., 594 F.3d 504, 512 (6th Cir. 2010); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990). First, the claimant must demonstrate that she is not currently engaged in "substantial gainful activity" at the time of the disability application. 20 C.F.R. § 404.1520(b). Second, the claimant must show that she suffers from a "severe impairment" in order to warrant a finding of disability. 20 C.F.R. § 404.1520(c). A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities." *Abbot*, 905 F.2d at 923. Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education, or work experience. *See* 20 C.F.R. § 404.1520(d). Fourth, if the claimant's impairment or combination of impairments does not prevent her from doing her past relevant work, the claimant is not disabled. 20 C.F.R. § 404.1520(e)-(f). For the fifth and final step, even if the claimant's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled. 20 C.F.R. §§ 404.1520(g), 404.1560(c).

Here, Kessler was insured on her alleged disability onset date, February 7, 2019, and remained insured through December 31, 2024, her date last insured ("DLI"). (Tr. 15.) Therefore, in order to be

entitled to POD and DIB, Kessler must establish a continuous twelve-month period of disability commencing between these dates.  Any discontinuity in the twelve-month period precludes an entitlement to benefits.  *See Mullis v. Bowen*, 861 F.2d 991, 994 (6th Cir. 1988); *Henry v. Gardner*, 381 F.2d 191, 195 (6th Cir. 1967).

## IV.    SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.    The claimant meets the insured status requirements of the Social Security Act through December 31, 2024.

2.    The claimant has not engaged in substantial gainful activity since February 7, 2019, the alleged onset date (20 CFR 404.1571 *et seq*.).

3.    The claimant has the following severe impairments: disorder of the lumbar spine/lumbar degenerative disc disease, inflammatory arthritis/degenerative joint disease, and obesity (20 CFR 404.1520(c)).

4.    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5.    After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) with no limit of on [sic] push/pull or foot pedals; can constantly use a ramp or stairs; can constantly use a ladder, rope, or a scaffold; can constantly balance; can occasionally stoop; can frequently kneel, crouch, or crawl; can constantly reach bilaterally in all planes; can frequently handle bilaterally; can constantly finger and feel bilaterally; and no visual, communication, environmental, or mental limitations.

6.    The claimant is unable to perform any past relevant work (20 CFR 404.1565).

7.    The claimant was born on February **, 1961 and was 57 years old, which is defined as an individual of advanced age, on the alleged disability onset date (20 CFR 404.1563).

8.    The claimant has at least a high school education (20 CFR 404.1564).

9.    The claimant has acquired work skills from past relevant work (20 CFR 404.1568).

10.    Considering the claimant's age, education, work experience, and residual functional capacity, the claimant has acquired work skills from past relevant work

12

that are transferable to other occupations with jobs existing in significant numbers in the national economy (20 CFR 404.1569, 404.1569a and 404.1568(d)).

11.   The claimant has not been under a disability, as defined in the Social Security Act, from February 7, 2019, through the date of this decision (20 CFR 404.1520(g)).

(Tr. 17-25.)

## V.   STANDARD OF REVIEW

The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)." *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 414 (6th Cir. 2011). Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards. *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009). Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)). In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion. *Buxton v. Halter*, 246 F.3d 762, 772-73 (6th Cir. 2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999) ("Even if the evidence could also support another conclusion, the decision of the Administrative Law

Judge must stand if the evidence could reasonably support the conclusion reached."). This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference. *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g., White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)); *accord Shrader v. Astrue*, No. 11-1300, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, No. 1:10-cv-734, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, No. 2:10-CV-017, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09-cv-1982, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI. ANALYSIS

As part of her first assignment of error that the ALJ's RFC lacked the support of substantial evidence, Kessler argues that the ALJ "fail[ed] to properly evaluate her mental limitations caused by her chronic condition and related pain and discomfort." (Doc. No. 7 at 19.) Kessler asserts the ALJ's

14

"[f]ailure to consider the limitations, including the mental limitations, attributable to pain in an individual's residual functional capacity is erroneous."  (*Id.*) (footnote omitted).

The Commissioner responds that Kessler waived this argument, as she "cannot point to a single mental health record that the ALJ should have discussed but did not discuss."  (Doc. No. 8 at 9.)  While Kessler argues she testified to difficulties with attention and concentration at the hearing, "the ALJ was not required to accept her subjective complaints."  (*Id.* at 10) (citation omitted).

In reply, Kessler argues that while the ALJ may not have been required to accept Kessler's subjective complaints, he was required to consider them.  (Doc. No. 9 at 7 n.8.)  Kessler asserts, without citation, that "Courts have recognized that chronic pain may be a valid cause for mental limitations, including impairment in one's ability to concentrate."  (*Id.* at 7.)

The RFC determination sets out an individual's work-related abilities despite his or her limitations.  *See* 20 C.F.R. § 404.1545(a)(1).  A claimant's RFC is not a medical opinion, but an administrative determination reserved to the Commissioner.  *See* 20 C.F.R. § 404.1527(d)(2).  An ALJ "will not give any special significance to the source of an opinion on issues reserved to the Commissioner."  *See* 20 C.F.R. § 404.1527(d)(3).  As such, the ALJ bears the responsibility for assessing a claimant's RFC based on all the relevant evidence (20 C.F.R. § 404.1546(c)) and must consider all of a claimant's medically determinable impairments, both individually and in combination.  *See* SSR 96–8p, 1996 WL 374184 (SSA July 2, 1996).

"In rendering his RFC decision, the ALJ must give some indication of the evidence upon which he is relying, and he may not ignore evidence that does not support his decision, especially when that evidence, if accepted, would change his analysis."  *Fleischer*, 774 F. Supp. 2d at 880 (citing *Bryan v. Comm'r of Soc. Sec.*, 383 F. App'x 140, 148 (3d Cir. 2010) ("The ALJ has an obligation to 'consider all evidence before him' when he 'mak[es] a residual functional capacity determination,' and must also

'mention or refute [...] contradictory, objective medical evidence' presented to him.")).  *See also* SSR 96-8p, 1996 WL 374184, at *7 (SSA July 2, 1996) ("The RFC assessment must always consider and address medical source opinions.  If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted.")).  While the RFC is for the ALJ to determine, the claimant bears the burden of establishing the impairments that determine her RFC.  *See Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 391 (6th Cir. 1999).

It is well-established there is no requirement that the ALJ discuss each piece of evidence or limitation considered.  *See, e.g., Conner v. Comm'r*, 658 F. App'x 248, 254 (6th Cir. 2016) (citing *Thacker v. Comm'r*, 99 F. App'x 661, 665 (6th Cir. 2004) (finding an ALJ need not discuss every piece of evidence in the record); *Arthur v. Colvin*, No. 3:16CV765, 2017 WL 784563, at *14 (N.D. Ohio Feb. 28, 2017) (*accord*).  However, courts have not hesitated to remand where an ALJ selectively includes only those portions of the medical evidence that places a claimant in a capable light and fails to acknowledge evidence that potentially supports a finding of disability.  *See e.g., Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 724 (6th Cir. 2014) (reversing where the ALJ "cherry-picked select portions of the record" rather than doing a proper analysis); *Germany–Johnson v. Comm'r of Soc. Sec.*, 313 F. App'x 771, 777 (6th Cir. 2008) (finding error where the ALJ was "selective in parsing the various medical reports").  *See also Ackles v. Colvin*, No. 3:14cv00249, 2015 WL 1757474, at *6 (S.D. Ohio April 17, 2015) ("The ALJ did not mention this objective evidence and erred by selectively including only the portions of the medical evidence that placed Plaintiff in a capable light."); *Smith v. Comm'r of Soc. Sec.*, No. 1:11-CV-2313, 2013 WL 943874, at *6 (N.D. Ohio March 11, 2013) ("It is generally recognized that an ALJ 'may not cherry-pick facts to support a finding of non-disability while ignoring evidence that points to a disability finding.'"); *Johnson v. Comm'r of Soc. Sec.*, No. 2:16-cv-172, 2016 WL 7208783, at *4 (S.D. Ohio Dec.

16

13, 2016) ("This Court has not hesitated to remand cases where the ALJ engaged in a very selective review of the record and significantly mischaracterized the treatment notes.").

When a claimant alleges symptoms of disabling severity, the ALJ must follow a two-step process for evaluating these symptoms. *See e.g., Massey v. Comm'r of Soc. Sec.*, 409 F. App'x 917, 921 (6th Cir. 2011). First, the ALJ must determine if there is an underlying medically determinable physical or mental impairment that could reasonably be expected to produce a claimant's symptoms. Second, the ALJ "must evaluate the intensity and persistence of [the claimant's] symptoms so that [the ALJ] can determine how [those] symptoms limit [the claimant's] capacity for work." 20 C.F.R. § 404.1529(c)(1). *See also* SSR 16-3p,[3] 2016 WL 1119029 (March 16, 2016).

If these claims are not substantiated by the medical record, the ALJ must make a credibility[4] determination of the individual's statements based on the entire case record. Credibility determinations regarding a claimant's subjective complaints rest with the ALJ. *See Siterlet v. Sec'y of Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 248 (6th Cir. 2007) (noting that "credibility determinations regarding subjective complaints rest with the ALJ"). The ALJ's credibility findings are entitled to considerable deference and should not be discarded lightly. *See Villareal v. Sec'y of Health & Human Servs.*, 818 F.2d 461, 463 (6th Cir. 1987). Nonetheless, the ALJ's "decision must contain specific reasons for the weight given to the individual's symptoms ... and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated

---

[3] SSR 16-3p superseded SSR 96-7p, 1996 WL 374186 (July 2, 1996) on March 28, 2016. Thus, SSR 16-3 was in effect at the time of the February 3, 2021 hearing.

[4] SSR 16-3p has removed the term "credibility" from the analysis. Rather, SSR 16-3p directs the ALJ to consider a claimant's "statements about the intensity, persistence, and limiting effects of the symptoms," and "evaluate whether the statements are consistent with objective medical evidence and other evidence." SSR 16-3p, 2016 WL 1119029, at *6. The Sixth Circuit has characterized SSR 16-3p as merely eliminating "the use of the word 'credibility' ... to 'clarify that subjective symptom evaluation is not an examination of an individual's character.'" *Dooley v. Comm'r of Soc. Sec.*, 656 F. App'x 113, 119 n.1 (6th Cir. 2016).

the individual's symptoms."  SSR 16-3p, 2016 WL 1119029; *see also Felisky*, 35 F.2d at 1036 ("If an ALJ

rejects a claimant's testimony as incredible, he must clearly state his reason for doing so").

To evaluate the "intensity, persistence, and limiting effects of an individual's symptoms," the ALJ

must look to medical evidence, statements by the claimant, other information provided by medical

sources, and any other relevant evidence on the record.  *See* 20 C.F.R. § 404.1529; SSR 16-3p, 2016 WL

1119029 (March 16, 2016).  Beyond medical evidence, there are seven factors that the ALJ should

consider.[5]  The ALJ need not analyze all seven factors but should show that he considered the relevant

evidence.  *See Cross*, 373 F. Supp. 2d at 733; *Masch v. Barnhart*, 406 F. Supp. 2d 1038, 1046 (E.D. Wis.

2005).

A careful review of the ALJ's decision reveals no mention of Kessler's testimony that her pain

interfered with her attention and concentration, especially when trying to return to work as an OR nurse.

(Tr. 15-25, 41-42, 45.)  While the Commissioner is correct that the ALJ was not required to *accept*

Kessler's subjective complaints, the regulations require the ALJ to *consider* the claimant's subjective

complaints in evaluating the impact of pain.  *See* 20 C.F.R. § 404.1529; SSR 16-3p, 2016 WL 1119029

(March 16, 2016).  As set forth above, "[i]n rendering his RFC decision, the ALJ must give some

indication of the evidence upon which he is relying, and he may not ignore evidence that does not support

his decision, especially when that evidence, if accepted, would change his analysis."  *Fleischer*, 774 F.

Supp. 2d at 880 (citing *Bryan v. Comm'r of Soc. Sec.*, 383 F. App'x 140, 148 (3d Cir. 2010) ("The ALJ

---

[5] The seven factors are: (1) the individual's daily activities; (2) the location, duration, frequency, and intensity of the individual's pain; (3) factors that precipitate and aggravate the symptoms; (4) the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; (5) treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; (6) any measures other than treatment the individual uses or has used to relieve pain or other symptoms; and (7) any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.  *See* SSR 16-3p, 2016 WL 1119029, at *7; *see also Cross v. Comm'r of Soc. Sec.*, 373 F. Supp. 2d 724, 732–733 (N.D. Ohio 2005) (stating that an ALJ, in a unified statement, should explain his or her credibility findings in terms of the factors set forth in the regulations, thereby permitting the court to "trace the path of the ALJ's reasoning.")

has an obligation to 'consider all evidence before him' when he 'mak[es] a residual functional capacity determination,' and must also 'mention or refute [...] contradictory, objective medical evidence' presented to him.")).  When relevant evidence is not mentioned, the Court cannot tell whether the ALJ discounted the evidence or overlooked it.  *Shrader*, 2012 WL 5383120, at *6.  A district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result."  *Fleischer*, 774 F. Supp. 2d at 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir. 1996)).  Remand is required.

As this matter is already being remanded, in the interest of judicial economy, the Court declines to reach Kessler's additional assignments of error.

## VII.    CONCLUSION

For the foregoing reasons, the Commissioner's final decision is REVERSED AND REMANDED for further consideration consistent with this opinion.

**IT IS SO ORDERED.**


Date: October 4, 2022                                         *s/ Jonathan Greenberg*
                                                             Jonathan D. Greenberg
                                                             United States Magistrate Judge